*Before the*
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| Consumers Research, *et al.* | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 26-60003 |
| Federal Communications Commission | ) | |
| and the | ) | |
| United States of America | ) | |

## MOTION TO INTERVENE

The Benton Institute for Broadband & Society (Benton), the National Digital Inclusion Alliance (NDIA) and the Center for Media Justice dba MediaJustice (MediaJustice) (collectively Movants), pursuant to 28 U.S.C. §2348 and Rule 15(d) of the Federal Rules of Appellate Procedure Rule 15(d) move to intervene in the above-captioned proceeding in support of Respondents. The Petition for Review in this proceeding was filed on January 6, 2026. Accordingly, this motion is timely filed pursuant to Rule 15(d).

Counsel for Respondents Federal Communications Commission (FCC) and the United States have stated that the government parties consent to the grant of this motion. Counsel for the Petitioners has stated that they oppose this motion.

Petitioners have brought this proceeding to challenge the constitutionality of two statutory provisions governing aspects of the FCC's Universal Service Fund (USF), as well as certain statutory and constitutional challenges to the operation

and authority of the USF and the formation and governance of the Universal Service Administrative Company (USAC).

## MOVANTS

Benton is a 44-year-old 501(c)(3) private operating foundation with a "goal to bring open, affordable, high-performance broadband to all people in the U.S. to ensure a thriving democracy." To effectuate that mission, Benton provides information and analyses about broadband policy. Expanding the scope and use of the USF programs is among its highest priorities. Benton works with partners throughout the country, and has organized broadband access coalitions in Pennsylvania, North Carolina and Missouri. These coalitions include recipients of USF funding in the e-rate and Rural Health Care (RHC) programs, and serve recipients of the Lifeline program. Benton assists these coalitions in educating the public about the nature and availability of USF funds and in applying for such funds. Benton and its coalitions have advocated, and will continue to advocate, for use of 47 U.S.C. §§254(c)(3) and 254(h)(2) to fund additional new services, including but not limited to supporting for school bus wifi and wifi hotspot loans.

Benton's mission would be significantly impaired if the USF were abolished or if the scope of Section 254 were narrowed. Its mission would also be harmed by the elimination of, or restrictions of, the existence, form or structure of USAC

temporarily or permanently.  Benton also would incur significant expenses revising its publications and educational materials and substantial personnel expenses in devising alternative mechanisms to insure that all Americans have access to affordable broadband service.

NDIA is a non-profit 501(c)(3) organization supporting a community of digital inclusion practitioners and advocates who engage in local and state-level efforts across the US to promote equitable internet access, adoption, and use for low- and moderate-income households and communities, whether urban, rural, or Tribal.  NDIA has over 2000 affiliates in all 50 states, all US Territories, the District of Columbia and partnerships with over 48 Tribal Entities.  Many of these are direct recipients of USF e-rate and RHC funds and also support Lifeline recipients.  Even those that do not directly receive USF funds support local groups that receive USF funding.  To educate, inform and service its affiliates, NDIA has frequent interaction with USAC and relies upon USAC's established educational and outreach functions to facilitate its affiliates' access to, and use of, covered services.  It also advances digital equity by supporting and promoting the work of organizations engaged in digital inclusion work, and educating policymakers and the public about digital equity.

NDIA's mission would be significantly impaired if the USF were abolished

or if the scope of Section 254 were narrowed. Its mission would also be harmed by the elimination of, or restrictions on, the existence, form or structure of USAC temporarily or permanently. If it were required to do so, NDIA also would incur significant expenses revising its publications and educational materials and substantial personnel expenses in devising alternative mechanisms to achieve digital equity, deployment and connectivity, including all programs funded by the USF.

MediaJustice is a non-profit, 501(c)(3) organization organized in 2009. It is dedicated to democratizing the economy, government, and society through policies and practices that, among other things, ensure democratic media ownership, fundamental communication rights, universal media, and technology access at affordable prices. MediaJustice works with a group of over 200 local, regional, or statewide affiliate social-justice organizations. MediaJustice also leverages its expertise through participation in several state and local coalitions devoted to broad and affordable access. Through research, the publishing and dissemination of reports, trainings, and strategic convenings and technical support, MediaJustice seeks to build a movement for a more just and participatory digital world. MediaJustice directly supports programs that enable users to obtain more affordable access to communications services and technology, including the

Lifeline and E-Rate programs funded by the USF.  MediaJustice will suffer severe harm if the people they serve no longer have access to USF funded programs.  In addition, MediaJustice would incur significant expense it had to revise its programs and publications.

**I.     THE HOBBS ACT ESTABLISHES THE STANDARD FOR INTERVENTION IN THIS CASE.**

Review in this proceeding is governed by the Hobbs Act, 28 U.S.C. §§2341, *et seq.* That provision gives this Court jurisdiction and sets out the procedures and standards governing review of the agency action below.  With respect to intervention, Section 2348 provides in relevant part that

> Communities, associations, corporations, firms, and individuals, whose interests are affected by the order of the agency, may intervene in any proceeding to review the order.

By specifying the qualification for intervention as extending to parties "whose interests are affected by the order of the agency," the Hobbs Act stands in distinction from other provisions of the U.S. Code that allow for direct review of agency actions in the Courts of Appeal but do not establish any standard for qualification for intervention.  Thus, cases such as *Texas v. U.S. Dept. of Energy*, 754 F.2d 550, 551 (5th Cir. 1985)(*Texas*), which are brought under the Nuclear

Waste Policy Act of 1982, 42 U.S.C. §§10101 *et seq.*,[1] or other statutes that are silent as to intervention are inapposite. *Compare* 28 U.S.C. §2348 (specific language governing intervention) *with* 42 U.S.C. §10139 (no reference to intervention). Lacking any statutory guidance, some of those cases look to Rule 24(a)(2) of the Federal Rules of Civil Procedure, but where, as here, there is a clear statutory reference to intervention, there is no need to refer to Rule 24(a)(2) or other authority. Following this principle, this Circuit has held in *United Gas Pipeline v. FERC*, 824 F.2d 417, 436-37 (5th Cir. 1987) relied on Section 2348 in granting intervention in a Hobbs Act case.[2]

In *International Union v. Scofield*, 382 U.S. 205 (1965), upon which *Texas* relied, the Supreme Court observed that "The Labor Act does not, however, provide explicitly for intervention at the appellate court level." *International Union*, 382 U.S. at 209. Thus, the Court said

> Lacking a clear directive on the subject, we look to the statutory design of the Act. Of course, in considering the propriety of intervention in the courts of appeals, our discussion is limited to Labor Board review proceedings. Federal agencies are not fungibles for intervention purposes -- Congress has treated the matter with attention to the particular statutory scheme and agency.

---

[1]*See* 42 U.S.C. §§10139.
[2]The opinion noted that this holding was in accord with *Illinois Bell Telephone Co. v. FCC*, 740 F.2d 465 (7th Cir. 1984). *See also Wold Communcations v. FCC*, 735 F.2d 1465, 1473 n.20. (D.C. Cir. 1984).

*Id.*, 382 U.S. at 210 (citation omitted).

In holding that each judicial review statute must be examined separately, "with attention to the particular statutory scheme and agency," *id.,* the Supreme Court made plain that "[i]n some instances, the words of the statute themselves elicit an answer." *Id.* And here, unlike the Nuclear Waste Policy Act at issue in *Texas,* the words of the Hobbs Act *do* provide an answer, and there *is* a clear "statutory design." Section 2348 expressly describes a permissive regime, one that as a matter of policy is well-suited for the agencies that fall within the ambit of the Hobbs Act. The design of the Hobbs Act balances the interest in fairness and judicial economy with the need for Article III standing to seek judicial review. Whatever the concerns there may be about difficulties arising from intervention under other statutory schemes, it makes sense that there should be a permissive standard for intervention in cases involving regulatory bodies that issue rules and policies with broad societal impact, such as the FCC.

The structure of the Hobbs Act reinforces this policy of singularity and finality. It grants the courts of appeals "exclusive jurisdiction to make and enter...a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency." Hobbs Act proceedings often determine the validity of broad, legislative-type administrative rules with

maximum national finality. Because it charges a reviewing appellate court with great responsibilities, broad party participation is especially beneficial in carrying out that function. Allowing interested persons to participate in the single forum designated for review improves the quality of judicial decisionmaking and ensures that all parties who will be legally bound by the subsequent decision have a meaningful opportunity to be heard.

This litigation is a paradigmatic example of when an agency order involving a single party below can affect a large number of regulated entities, consumers and other stakeholders. Overly restrictive intervention standards could leave many affected parties unrepresented in the one dispositive proceeding. The immediate consequence of such a restriction would be to deprive these parties of any meaningful opportunity to contribute arguments or evidence before the decision's validity is definitively settled. The permissive intervention standard set forth in Section 2348 is therefore an institutional mechanism designed to ensure that the single, legally decisive proceeding is comprehensive.

### III. MOVANTS QUALIFY FOR INTERVENTION UNDER THE HOBBS ACT.

Movants easily meet the requirements for intervention under 28 U.S.C. §2348. As set forth above, each Movant has a strong interest in continuation of

the Universal Service Fund in its present form. While they need not meet Article III standing requirements,[3] they would incur significant harm were Petitioners to succeed in, among other things, invalidating the FCC's USF administrative scheme in general and Sections 254(c)(3) and 254(h)(2) of the Communications Act in particular, or to eviscerate the Universal Service Administrative Company and its operation. *See* Petition for Review at pp. 4-5. Insofar as dismissal of the Petition for Review would dispel these threats, it is self-evident that this outcome would advance Movants' interests.

## IV. EVEN IF THIS COURT WERE TO LOOK TO RULE 24(a)(2) PRINCIPLES, MOVANTS MORE THAN SATISFY THAT RELATIIVELY LOW BAR.

Even were this motion to be analyzed with reference to Rule 24(a)(2), Movants respectfully submit that they easily pass the four part test for assessing intervention under Rule 24(a)(2) and this motion should be granted on that basis were it to be employed.

There should be no dispute that Movants qualify under the first three

---

[3]*See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (explaining that it was "not...incumbent" for an intervenor or appellee to demonstrate standing when "neither role entailed invoking a court's jurisdiction,..."); *Kreit v. Quinn*, 26 F.4th 285, 294 (5th Cir. 2022) (citing Bethune-Hill among other authorities to reject argument that a party "seeking to defend an appeal" must "show he would have standing").

elements set out in Rule 24(a)(2), as this motion is timely filed, Movants are interested parties and grant of any portion of the petition for review would interfere with Movants' ability to fulfill their missions and to protect their affiliates.

As to the remaining question, adequacy of representation, even were that to be relevant notwithstanding that this is a Hobbs Act case, the burden on the moving party under Rule 24(a)(2) is "minimal." *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994). And "[t]he applicant need only show that representation 'may be' inadequate." *Id.* As this Court said more recently in *La Union del Pueblo Entero v. Abbott*, 29 F.4th 307-08, the Movant "'need not show that the representation by existing parties will be, for certain, inadequate,' but instead that it *may* be inadequate." *Id.* (quoting *Texas v United States*, 805 F.3d 653, 661 (5th Cir. 2015)(emphasis in the original).

In this regard, the history of Petitioners' series of challenges to the USF are of considerable relevance. Notably, after Movants and their co-intervenors filed a petition for writ of certiorari with respect to this Court's decision in No. 22-60008, Petitioners asked the Supreme Court to hold the petition, arguing that the intervenors' "interests are adequately represented by the government...." Brief for the Respondents at 2, *SHLB Coalition, et al. v. FCC*, No. 24-422 (filed October

16, 2024). The Court nonetheless granted the intervenors' petition for certiorari and consolidated it with the government's petition for certiorari. Movants and the other intervenors filed separate briefs and were allowed to present separate oral argument before the Court

The interests at stake that supported the Supreme Court's acceptance to the intervenors' certiorari petition, and prior appeals court orders allowing Movants to intervene remain. Importantly, while all the previous companion cases brought by Petitioners in each successive calendar quarter since 4Q21 were directed solely at the non-delegation and private non-delegation issues ultimately addressed by the Supreme Court, the Petition for Review in this proceeding raises several new issues. The addition of these issues increases the harms Movants face and could expand their divergence in interests with the government. Among other things, in addition to specifically challenging the constitutionality of 47 U.S.C. §254(c)(3) and 47 U.S.C. §254(h)(2), for the first time, Petitioners also make the new claim that the FCC must go back to the drawing board and entirely revise its jurisprudence on Section 254 based on Petitioners' claim that the Supreme Court has somehow invalidated thirty years of FCC administration of Section 254. Petition for Renew at 4. For the first time, they also present four additional issues with respect to USAC's operations in conformance with Article II, the

Commission's authority to appoint USAC to administer the USF at all, violation of the Government Corporation Control Act, and violations of the due process clause by USAC. Petition for Renew at 5.

This Court has described two instances where there is a presumption of adequate representation. Neither is operative here. The first presumption applies only in cases where the Respondent "is presumed to represent the interests of all of its citizens," *Hopwood v. Texas*, 21 F.3d 603, 605 (5th Cir. 1994)(per curiam), such as "when the putative representative is a governmental body or officer charged by law with representing the interests of the [intervenor]," *Texas v. United States*, 805 F.3d at 661 (quotation omitted). Here, the FCC and United States are deemed to represent "the broad public interest," not just those of the particular proposed intervenors. *Sierra Club v. Espy*, at 1208; *see also Doe #1 v, Glickman*, 256 F.3d 271, 280-81 (5th Cir. 2001). In this instance, the FCC is managing the collection and distribution of funds where there are competing interests seeking such funding, and where the government's interest in minimizing expenditures may be at odds with Movants' wishes.

The second presumption arises when the government and the supporting intervenors "share the same ultimate objective." But as this court held in *Brumfield v. Dodd*, 749 F.3d 339, 345-46 (5th Cir. 2014), the presumption did not apply even

where the intervenors supporting the government share the goal of affirmance because the government has "many interests" at stake, whereas the intervenors were concerned with making sure that benefits are maximally available, so that their interests "may not align precisely."

At the outset, Movants stress that, while they share some common interests with Respondents, they nonetheless have different objectives. *See, e.g., Entergy Gulf States La, LLC v. Environmental Protection Administration*, 817 F.3d 198, 203. As Movants' interests are based on their missions of greater access and use, and expansion of, USF programs, they complement, but are different from, the interests of the governmental Respondents. Among other things, the primary interests of the Respondents relate to the administration of the USF, whereas Movants seek to broaden the program. Thus, for example Movants have advocated, and will continue to advocate, for use of 47 U.S.C. §§ 254(c)(3) and 254(h)(2) to fund additional new services. In two recent instances, Respondent FCC has taken a position adverse to Movants as to the application of those provisions to allow e-rate funds to be used for school bus wi-fi and lending of wifi hotspots. See *Modernizing the E-Rate Program for Schools and Libraries;* FCC 25-63, WC Docket 13 184 at 2 (September 30, 2025); *Addressing the Homework Gap Through the E-Rate Program*, FCC 25-62, WC Docket No. 21-31 at 11 (Sept.

30, 2025).

Respondents' and Movants' interests in this case overlap, but are far from identical, and are more than sufficient for the purposes of Rule 24(a)(2).[4] Indeed, this divergence is now far greater than in the past. The Petition for Review now takes aim at USAC on multiple bases that were not previously at issue. With the core constitutionality of Section 254 no longer in doubt, impairment or abolition of USAC poses a far greater threat to Movants than to the Respondents. While the FCC could respond to an adverse decision by administering USF programs on its own, or by creating a new entity that did not have the same alleged flaws with respect to USAC's governance, Movants have a powerful interest in maintaining the current structure of USAC and its governance. For one particular example, 47 C.F.R. §54.703(b) provides that USAC's board membership include, *inter alia*, representatives of schools,[5] of libraries,[6] of rural health care providers,[7] of low income consumers,[8] of state consumer advocates[9] and of Tribal Communities.[10]

---

[4]*See Brumfield v. Dodd*, 749 F.3d 339, 346 (5th Cir. 2014)("We cannot say for sure that the state's more extensive interests will in fact result in inadequate representation, but surely they might, which is all that the rule requires.").
[5]See 47 C.F.R. §54.703(b)(7).
[6]See 47 C.F.R. §54.703(b)(8).
[7]See 47 C.F.R. §54.703(b)(9).
[8]See 47 C.F.R. §54.703(b)(10).
[9]See 47 C.F.R. §54.703(b)(12).
[10]See 47 C.F.R. §54.703(b)(13).

Movants would be severely impaired if USF programs were no longer administered by an entity that lacked such representation.

## CONCLUSION

Accordingly, Benton, NDIA and MediaJustice respectfully request that the Court grant this motion to intervene in support of Respondents FCC and the United States, and grant all such other relief as may be just and proper.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

February 1, 2026

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Petitioners are: Consumers' Research; Cause Based Commerce, Incorporated; Edward J. Blum; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kirby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; Rhonda Thomas; James Romeo; Cody Carnet, Phillip Aronoff and Jacqueline Klein.

2. Counsel for Petitioners are: James Conde and Laura B. Ruppalt of Boyden Gray PLLC.

3. The Federal Communications Commission is a federal agency, and the United States of America is a respondent by statute. Counsel for the United States are Pamela Bondi and P. Michele Ellison.

4. Counsel for the Federal Communications Commission are: Pamela Bondi, P. Michele Ellison, and James Carr. Counsel for the United States of America are: Pamela Bondi and P. Michele Ellison.

5. Counsel for Movant-Intervenor Schools, Health & Libraries Broadband Coalition are Jason Neal and Sean A. Lev of HWG, LLP.

6. Movant Benton Institute for Broadband & Society, Center for Media Justice dba MediaJustice and National Digital Inclusion Alliance are incorporated 501(c)(3) public interest organizations which share the goal of promoting open, affordable, high-quality broadband in the United States.  As non-profit corporations which have not issued stock, they have no owners or subsidiaries, and accordingly, no parent corporation and no publicly held corporation owns 10% or more of their stock.

7. Counsel for Movants is Andrew Jay Schwartzman of Andrew Jay Schwartzman, PLLC.

8. Pursuant to Fifth Circuit Rule 28.2.1, the following describes the "large group of persons or firms" that may be "financially interested in the outcome" of this litigation:  Petitioners challenge the Federal Communications Commission's approval of the *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, Public Notice, DA 25-840, CC Docket No. 96-45 (released September 15, 2025).  Carriers which must remit fees based on their interstate end-user revenues to the Universal Service Fund have a financial interest in the outcome of this litigation.  The Universal Service Fund pays for four programs: the "Lifeline/Link Up" program, the "High-Cost" program, the "Schools and Libraries" program,

and the "Rural Health Care" program. Beneficiaries of the four Universal Service Fund programs, service providers covered by those programs, and other elements of telecommunications industry have, or potentially may have financial interests in the outcome of this litigation.

                                                    Respectfully submitted,

                                                    /s/ Andrew Jay Schwartzman  
                                                    Andrew Jay Schwartzman  
                                                    525 Ninth Street, NW  
                                                    Seventh Floor  
                                                    Washington, DC 20004  
                                                    (202) 241-2408  
                                                    AndySchwartzman@gmail.com

February 1, 2026

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with [the type-volume limit of FED. R. APP. P. 28(d)(2)(A) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f):

    **X**    this document contains **3143** words, **or**

    G    this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

    **X**    this document has been prepared in a proportionally spaced typeface using WordPerfect 2021 in 14 point Times Roman, or

    G    this document has been prepared in a monospaced typeface using _____ with _____.

    /s/ Andrew Jay Schwartzman

    Attorney for Benton Institute for Broadband & Society, National Digital Inclusion Alliance and Media Justice.

February 1, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2026, I electronically filed the foregoing *Motion to Intervene* with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the Court's appellate CM/ECF system. I further certify that service was accomplished on all participants in the case via the Court's CM/ECF system.

    Respectfully submitted,

    /s/ Andrew Jay Schwartzman

    Andrew Jay Schwartzman
    525 Ninth Street, NW
    Seventh Floor
    Washington, DC 20004
    (202) 241-2408
    AndySchwartzman@gmail.com